IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|   |   |   |   |
|---|---|---|---|
| CHRISTINE A. THOMPSON, | ) | | |
| | ) | | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00023 | |
| | ) | | |
| v. | ) | **MEMORANDUM OPINION** | |
| | ) | | |
| ROCKINGHAM COUNTY, | ) | By: | Hon. Thomas T. Cullen |
| VIRGINIA, *et al.*, | ) | | United States District Judge |
| | ) | | |
| | ) | | |
| Defendants. | ) | | |

Plaintiff Christine Thompson ("Thompson"), a former local government employee, filed this action against five Defendants—Rockingham County, Virginia ("the County"), Harrisonburg, Virginia, and Patricia Davidson (collectively, the "Municipal Defendants"), as well as Family Educational Services, LLC ("FES") and Debra S. Clatterbuck (collectively, the "FES Defendants")—alleging that they violated her federal due process rights, defamed her, tortiously interfered with her employment, and fired her in violation of public policy. (*See* Compl. ¶¶ 63–131 [ECF No. 4-1].) Defendants have moved for summary judgment on each of Thompson's claims against them. (ECF Nos. 40, 42.) After reviewing the pleadings, motions, and the voluminous factual record, the court will grant the Municipal Defendants' motion as to Counts I and VI and deny the motions in all other respects.

## I.   BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Thompson. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Factual Setting

Plaintiff Christine Thompson is a Virginia resident who, from 2005 to February 20, 2020, worked in the Children's Services Act ("CSA")[1] office for Harrisonburg and Rockingham County. (Compl. ¶ 11; Christine Thompson Dep. 12:1–3, 252:20, Nov. 16, 2022 [attached hereto as Appendix A].) Thompson originally served as CSA coordinator until 2018, when she was promoted to CSA manager. In that position, her duties included overseeing day-to-day operations of the CSA office, facilitating invoice payments, and supervising three CSA employees. (Thompson Dep. 14:12–18, 15:1–21, 18:7–20, 19:14–20, 30:24–31:10, 252:25–253:5; CSA Manager Job Description [ECF No. 41-6].)

Once promoted to CSA manager, Thompson was directly supervised by Patricia Davidson—Rockingham County's finance director—who co-chaired the CPMT along with Ande Banks, Davidson's counterpart in the City of Harrisonburg. (Davidson Dep. 38:10–18.) When Thompson was promoted, Stephen King, County Administrator for Rockingham County, instructed Davidson that one of her primary responsibilities would be improving "the level of professionalism and customer service by the CSA office managed by Thompson," and

---

[1] The CSA (previously titled Comprehensive Services Act) is a Virginia law that establishes a single state pool of funds for at-risk youth and their families. State funds, combined with local community funds, are managed by local interagency teams who plan and oversee services to eligible youth. (Screenshot of http://www.csa.virginia.gov [ECF No. 48-1]; Thompson Dep. 12:13–17.) To implement the CSA, the community policy and management team ("CPMT") establishes policies governing the referral of troubled youth and families to the local family assessment and planning team ("FAPT"). Va. Code § 2.2-5209. The FAPT assesses the strengths and needs of those youth who are approved for referral, identifies and determines the services required to meet these needs, develops plans to provide for appropriate services, and recommends to the CPMT expenditures from the local allocation of the state pool of funds. Va. Code § 2.2-5208. As relevant here, Rockingham County and the city of Harrisonburg jointly implement the CSA through the Harrisonburg/Rockingham CPMT. (Screenshot of http://www.rockinghamcountyva.gov/590/Childrens-Services-Act [ECF No. 48-7].) The CSA office works with the FAPT and CPMT to recommend local policy and implement the CSA on a local level. (Thompson Dep. 20:3–8, 22:24–23:16; Patricia Davidson Dep. 31:6–22, Nov. 21, 2022 [attached hereto as Appendix B].)

was directed "to inform [King] about complaints when they occurred . . . ." (Stephen King Aff. ¶ 11, Jan. 18, 2023 [ECF No. 41-1]; *see* Promotion Email Chain [ECF No. 41-5].)

In her role as CSA manager, Thompson recommended local policy and procedure to the CPMT, implemented policies approved by the CPMT, and communicated those policies to member agencies, which she did by helping to draft a manual summarizing those policies. (Thompson Dep. 23:5–24:10, 224:9–20; Davidson Dep. 31:9–14, 32:6–11.) But Thompson did not have the authority to create or approve policy on her own, despite being the day-to-day policy and procedural driver. (*Id.* 21:5–17, 23:24–24:10, 223:15–21; Davidson Dep. 31:8–32:2.) Thompson also did not have any authority to approve or deny payments to vendors, as that was within the province of the FAPT; it made final decisions regarding which vendors were eligible for CSA funds. (*Id.* 51:12–53:8, 191:4–7.)

Once the FAPT met and approved services for youth and families to be rendered by a particular vendor, Thompson would oversee the CSA office's generation of a purchase order that listed the vendor, the child, the approved services, the duration and cost of services, and the total amount of funds earmarked for the designated services. (*Id.* 90:2–15; Karen Tanner Decl. ¶¶ 6, 7, Jan. 28, 2023 [ECF No. 47-12].) The purchase order would also contain an invoice that was to be completed by the vendor and returned to the CSA office before payment would be issued.[2] (*Id.*; Tanner Decl. ¶¶ 6, 7) Karen Tanner—the CSA data specialist that Thompson supervised—would prepare the original invoice once the FAPT approved the

---

[2] The process for a vendor to receive payment for services through the CSA office was included in a Provider Contract. (Tanner Decl. ¶ 8.) The Provider Contract required vendors to submit invoices within 15 days after the end of the month in which the services had been provided. (Thompson Dep. 242:21–243:2; Provider Contract ¶ 10 [ECF No. 48-16].)

services and provide that invoice to the vendor. (Tanner Decl. ¶ 7.) The vendor was then required to complete the information on the invoice; attach supporting documentation to show the date, type, and amount of services actually provided to the child or family listed on the invoice; then sign, date, and submit the invoice to the CSA office. (*Id.*) Until the CSA office received invoices and supporting documentation from the vendor, the CSA office considered those invoices to be "outstanding."[3]

Once an invoice was properly submitted to the CSA office, it would be sent to the Department of Social Services ("DSS" or "HRSSD") for review, approval, and signature by the requisite social worker and supervisor. (Thompson Dep. 109:6–11; Tanner Decl. ¶ 10.) After reviewing and signing the invoice, DSS would return it to the CSA office, where Tanner would put the date of receipt on the unfiled vendor report; Thompson would review, approve, and date the invoice, then place it in a box where it would be picked up by County finance office staff who were responsible for making payment. (*Id.* 109:12–17, 111:17–25.) Ultimately, payment was to be issued within 45 days of the vendor submitting its invoice. (*Id.* 242:24–243:2; Davidson Dep. 166:6–10, 182:22–183:4; Tanner Decl. ¶ 8.) If a vendor did not abide by these procedural requirements, CSA was not obligated to pay for the vendor's services. (Provider Contract ¶ 10; Tanner Decl. ¶ 8.)

---

[3] The CSA office kept spreadsheets to log when it received invoices. (Thompson Dep. 232:18–22.) Tanner ran unfiled vendor reports on a weekly basis to review outstanding invoices not received from vendors and would contact them to request that they submit invoices for payment. (*Id.* 71:18–22.) The unfiled vendor reports showed the encumbered funds for approved services that the CSA office would owe if a vendor provided all the services approved in a particular period. (Davidson Dep. 187:25–188:16.)

## B. Historical Issues with FES

The CSA office's invoice system occasionally led to problems with some vendors and, specifically, FES,[4] a company founded by Debra S. Clatterbuck in 2002.[5] (Clatterbuck Dep. 16:24–17:2; Davidson Dep. 203:13–14.) FES was a large vendor that had a Provider Contract with the CSA office and had a history of providing improper documentation to the CSA office. (Tanner Decl. ¶¶ 5, 7, 8, 11–13; Thompson Dep. 139:3–25; Davidson Dep. 200:14–15.) For example, on at least one occasion in 2018, FES billed for services that were not covered by the CSA, but CSA approved payment. (Thompson Dep. 243:23–244:4; Clatterbuck Dep. 52:18–53:20; Davidson Dep. 174:19–175:7.) When Thompson found out about the payment for unauthorized services, she brought the issue to Davidson and Banks, the CPMT co-chairs, who told her that FES would be required to pay the money back. (*Id.* 244:7–16; Davidson Dep. 175:8–10.) Thompson requested repayment from FES in a series of three letters,[6] the first two of which were not responded to. (*Id.* 244:19–245:8.) Nine months after the first letter was sent, FES sent the CSA office a check in the amount of $1,132.50 to satisfy the CSA office's payment for unauthorized services. (Thompson Letter to Taylor Wolf at 11.)

---

[4] Clatterbuck indicated that FES is no longer in existence. She wound down its operations in May of 2020. (Debra S. Clatterbuck Dep. 28:21–29:3, Nov. 22, 2022 [attached hereto as Appendix C].)

[5] FES provided in-home and community-based case work for families in need. (Clatterbuck Dep. 14:3–15.) For example, FES provided services to families to "develop healthy meal plans and to go to the grocery, budgeting, those types of things." (*Id.* 18:2–5.)

[6] Thompson sent letters requesting reimbursement on December 21, 2018, July 25, 2019, and September 11, 2019. (Thompson Dep. 244:19–245:8; Thompson Letter to Clatterbuck [ECF No. 48-6]; Thompson Letter to Taylor Wolf [ECF No. 48-21].)

### C. Purported Issues with Thompson's Job Performance & Corrective Action Notices

Davidson testified that, beginning in November of 2019, she started "having some real issues, serious issues, like every month," with Thompson. (Davidson Dep. 133:22–134:5.) Davidson apparently met with Banks on November 6, 2019, to discuss these issues. (*Id.* 134:9–11.) Though Davidson does not remember exact details of her conversation with Banks, she followed up with him in an email that included a list of instances[7] "where [Davidson] had to correct or redirect" Thompson's conduct so that Banks could be better informed of what Davidson "was dealing with." (*Id.* 133:22–25, 134:3–8; Davidson's November 6, 2019 Email to Banks.) Indeed, Davidson's email stated that "[t]he number of instances that [Thompson] requires redirection, coaching, reminding . . . seems like quite a bit for a manager position." (Davidson's November 6, 2019 Email to Banks (cleaned up).) At the conclusion of the email, Davidson added that, in her job as CSA manager, Thompson had "not done a good job at movement [*sic*] the dial forward." (*Id.*)

In January 2020, two months following Davidson's meeting with Banks, Thompson received two Corrective Action Notices ("CANs") dated January 10 and January 21, 2020, respectively. (*See* CANs [ECF No. 41-7].) The January 10, 2020 CAN related to a situation where funding was denied, at Thompson's behest, in four cases regarding services for the Comprehensive Services Board ("CSB"). (CANs at 2; Davidson's Jan. 2, 2020 Email Chain [ECF No. 43-4].) The CAN details that the CSB had to conduct its own research which

---

[7] The list provided to Banks includes 26 instances of corrective conduct beginning in October of 2017 and ending with an instance in October of 2019. (Davidson's Nov. 6, 2019 Email to Banks [ECF No. 48-9].) To the court's knowledge, none of these instances resulted in Corrective Action Notices being sent to Thompson.

demonstrated that funding should have been provided, contrary to what Thompson had advised. (*Id.*) Davidson believed that "[Thompson] should have done many things differently," and that her handling of the situation was improper. (*Id.*)

On January 21, 2020, Thompson received her second CAN, which stemmed from a meeting between Davidson and Clatterbuck on January 16, 2020. (*Id.* at 3.) On that date, the two met to discuss money Clatterbuck claimed that FES was owed for services rendered in November and December 2019.[8] (Clatterbuck Dep. 62:15–22; Davidson Dep. 163:19–23.) Clatterbuck complained that FES had approximately $40,000 in unpaid invoices for services rendered in November and December 2019.[9] (Davidson Dep. 164:1–6.) According to Plaintiff, Clatterbuck told Davidson:

> FES was having issues regarding not getting paid in a timely manner for services performed for the CSA office; FES was owed more than $40,000 for November and December 2019 and [Clatterbuck] needed money to pay bills and that Clatterbuck had emailed CSA and received no response; [Clatterbuck] could not handle the stress of facing [Thompson] and there was a history with the CSA office that [Clatterbuck] did not want to deal with at the moment; in [Clatterbuck's] experience, if [Thompson] likes a vendor, they get paid timely but if she doesn't, they have to wait for their money; the time difference in which FAPT approves a service and CSA provides the invoice is detrimental to the kid's well-being; "what [Thompson] says to [Clatterbuck] will not be

---

[8] FES had submitted to the CSA office several invoices for services rendered in December 2019, but Tanner noticed that some invoices were improperly submitted or not signed. (Tanner Decl. ¶ 15.) As such, Tanner reached out to Sarah Arey, an FES employee, requesting that FES correct these issues. (*Id.*; Tanner's Jan. 8, 2020 Email to Sarah Arey [ECF No. 48-17].) Based on the correspondence, Clatterbuck was apparently under the impression that it would be best to speak with Davidson to resolve the invoice issues. (Clatterbuck Dep. 79:11–15.)

[9] By this time, Clatterbuck had not been intimately involved with FES for almost two months; she was not responsible for FES invoices, nor had she been a part of FES's daily operations for almost a year. (Clatterbuck Dep. 32:12-23, 78:3–4, 79:24–80:5, 94:17–20, 100:22–101:14.) Despite Clatterbuck's quasi-retirement, Davidson testified that "[Clatterbuck] was very apologetic for coming in the office, but she was very stressed out and just worried that she was not going to be able to pay her bills." (Davidson Dep. 172:3–15.) She also testified that Clatterbuck "did not want [Thompson] to get in trouble. She just wanted her money." (*Id.*)

> the whole truth"; she has no confidence that what [Thompson] says to her is the whole truth; [Clatterbuck] is retiring due to the stress of dealing with the CSA office; and [Thompson] makes disrespectful and unprofessional comments about FES, including asking "why would you use them."

(Compl. ¶ 41; Pl.'s Resp. to Clatterbuck and FES's Interrog. No. 13 [ECF No. 43-10].) Davidson took notes during this meeting (Davidson Meeting Notes [ECF No. 48-11]; Davidson Dep. 27:15–19, 172:24–173:4), "accepted [Clatterbuck's statement's] as true," and later memorialized those statements[10] in the second CAN regarding Thompson's handling of the situation. (Davidson Dep. 223:22–224:1; *see* CANs.)

At the close of the January 16, 2020 meeting, Davidson asked Clatterbuck to send her the invoices "so [she] could work to get them paid." (*Id.* 168:16–25.) Once Clatterbuck left Davidson's office, Davidson checked the accounts receivable reports to find out how much money FES was owed. (*Id.* 186:17–25.) Davidson determined that there were $40,000 in invoices that were due for November and December, as well as other invoices for August through October of 2019. (*Id.*)

Once Davidson's investigation was complete, she began preparing the January 21, 2020 CAN, with Clatterbuck's statements pasted into the notice. (*Id.* 192:14–193:10; Thompson Dep. 215:9–216:3; *see* CANs at 3.) Davidson believed that Thompson had failed to meet acceptable work standards in her dealings with FES, contending that the "November and December invoices were delivered to the CSA office and they were not processed," and she

---

[10] Although Clatterbuck could not remember the exact words she used during her conversation with Davidson, she stated that if Davidson wrote them down, she likely made those statements. (Clatterbuck Dep. 88:8–88:20, 89:1–90:11.)

referenced her conversation with Clatterbuck as a "tangible example of how [Thompson] did not follow through on her work responsibilities." (*Id.* 199:5–201:9.)

On January 21, 2020, Davidson and King met with Thompson to discuss her CANs and overall job performance. (King Aff. ¶ 12; Davidson Dep. 198:13–199:4; Thompson Dep. 84:6–22; King's Jan. 22, 2020 Email to Mongold [ECF No. 48-37].) In the meeting, Davidson and King read the CANs to Thompson, reviewed the guidelines for the payment of invoices, told Thompson that CSA would be moved under the supervision of DSS,[11] and that Thompson "should look for employment elsewhere." (Davidson's Jan. 21, 2020 Email to King [ECF No. 48-13]; Davidson Dep. 198:13–199:11; Thompson Dep. 84:18–85:19; King's Jan. 22, 2020 Email to Mongold.)

---

[11] This was the first time Thompson heard that the CSA office would be transferred to DSS. (Thompson Dep. 194:10–14.) But according to Davidson, she and Celest Williams, the Director of DSS, first considered transferring the CSA office from the city/county to the DSS department in late 2019. (Davidson Dep. 90:5–18; King Aff. ¶ 16.) From late 2019 until the move was finally approved on January 23, 2020, Davidson had multiple discussions with Williams regarding "how much money [the county] could save" if the CSA operation was transferred to DSS, which positions would be transferred, and overall logistics of such a transfer. (Davidson Dep. 90:5–92:9, 100:21–101:21; *see* Williams Jan. 3, 2020 Email to Davidson [ECF No. 43-2].) Though Davidson contends that no decision was made to transfer the CSA office to DSS in September 2019 (*Id.* 89:22–90:3), the record suggests that it was a foregone conclusion by January 2, 2020, prior to Thompson's receipt of her CANs. On that date, King sent an email to Banks, referring to Thompson and the impending move, stating, "I'm convinced that we should eliminate the CSA Manager position and move the CSA operation back to the DSS building, with daily oversight to be provided by the Director of Social Services . . . . We have a supervisor who has consistently demonstrated an unwillingness or inability to improve." (King's Jan. 2, 2020 Email to Banks [ECF No. 43-5].)

　　Moreover, Davidson knew of this impending decision; on that same day, Davidson emailed Banks, "[King] wants [Banks] and [Campbell] to be on board if/when the time comes to make a change." (Davidson's Jan. 2, 2020 Email Chain.) And Mongold's email correspondence with Davidson confirms this. Indeed, Mongold sent an email to Davidson on January 3, 2020, which stated, "I changed Karen's title to Data Specialist and Cheryl's to Admin Assistant. I also added some comments as to why the position was changed from coordinator to manager. And while I'm typing, it should probably be added that none of the initiatives that [Thompson] was tasked with in becoming a manager took place—more reasoning to support that we don't need a manager level position." (Mongold's Jan. 3, 2020 Email to Davidson at 3 [ECF No. 43-6].) Shortly thereafter, on January 23, 2020, the HRSSD Administrative Board approved the move and reorganization by resolution, which did not include a transfer of Thompson's position. (King Aff. ¶ 18; Administrative Board Minutes [ECF No. 41-10].)

After meeting with King and Davidson, Thompson retained counsel to file a grievance regarding her two CANs, but she was not permitted to because county officials claimed that she was a manager and an at-will employee.[12] (Thompson Dep. 193:13–194:9; Davidson Dep. 219:16–220:10; King Aff. ¶ 13; Thompson's Jan. 30, 2020 Letter to Davidson [ECF No. 47-22]; Thompson's Jan. 31, 2020 Letter to Davidson [ECF No. 48-25].) Sometime after becoming aware that Thompson had retained counsel on January 22, 2020, Davidson purportedly told Tanner that she was advised to stop communicating with Thompson and that the CSA transition to DSS had to be moved up by six months. (Davidson Text Messages [ECF No. 48-35]; Tanner Decl. ¶ 23.)

### D. Events Post-CANs

On January 24, 2020, per Davidson's earlier request to get her the unpaid invoices, Clatterbuck came to the CSA office and delivered "a stack" of invoices to Davidson, who gave them to Tanner to process.[13] (Tanner Decl. ¶ 17; Thompson Dep. 233:11–21; Davidson Dep. 169:2–9.) Those invoices were ultimately paid by January 31, 2020. (Davidson Dep. 169:2–9; *see* Thompson Dep. 233:16–21.)

On January 28, 2020, Thompson's counsel submitted a FOIA request to the county and told the county attorney he represented Thompson. (Cupp's January 28, 2020 Letter to Miller [ECF No. 47-21].) That same day, regarding Thompson's request for a grievance,

---

[12] The Rockingham County Handbook maintains that its employees are at-will, and the corresponding Grievance Procedure expressly excludes managerial employees from the County's grievance process. (King Aff. ¶ 4; *see* County Grievance Procedure [ECF No. 41-2].)

[13] Tanner and Thompson both contend that they never received the original invoices for FES prior to January 24, 2020, when Davidson gave them to Tanner. (Thompson Dep. 233:11–15; Tanner Decl. ¶ 19.) The invoices delivered on January 24, 2020, were the ones Clatterbuck complained about in her January 16, 2020 meeting with Davidson.

Mongold—Rockingham County's HR Director—sent an email to Thompson, Davidson, and Banks, contending that "the most straight-forward interpretation of the County's [grievance] policy . . . is that CSA employees, though falling under Rockingham County for administrative purposes, do not fall under the County's grievance policy," and that, if they did,  Thompson still would not be covered by the policy "as she is in the very sort of managerial position that is exempted from the grievance policy." (Mongold's Jan. 28, 2020 Email [ECF No. 41-9].) Mongold followed on to outline the "parallel grievance process" that would nevertheless be afforded to Thompson, explaining that she would be permitted to meet with Banks and Davidson to hear her grievance. (*Id.*)

On February 3, 2020, Thompson met with Davidson and Banks to discuss her two grievances in the "parallel process." (Thompson Letter to King and Campbell at 1 [ECF No. 48-29].) When the meeting began, Davidson stated that the meeting was for listening to "the grievances held by Christine Thompson related to the two recent [CANs]" and that "[n]o response w[ould] be given" during the meeting. (Davidson's Feb. 3, 2020 Remarks [ECF No. 47-25] (cleaned up).) Following Davidson's statement, Thompson voiced her disagreement with the two CANs. (Thompson Dep. 219:24–220:14; *see generally* Thompson Letter to King and Campbell.) There was no "back and forth" discussion during the meeting, and neither Davidson nor Banks addressed the substance of Thompson's concerns. (Davidson Dep. 226:1–11; Thompson Dep. 221:5–12.) The meeting concluded with the understanding that a response would be provided by February 10, 2020. (Davidson's February 3, 2020 Remarks.)

Davidson and Banks delivered their response to Thompson's grievance on February 7, 2020. (Grievance Response [ECF No. 47-26].) The response merely listed Thompson's job

description and explained that "the Corrective Action Notices on January 10, 2020, and January 21, 2020, were directly related to the items stated in the CSA Manager job description and depict only one example of many failures to meet expectations of the position." (*Id.*) The response concluded that the "review team" would uphold the CANs. (*Id.*) On February 14, 2020, following the response to her "parallel process," Thompson, through counsel, sent a letter to King and Eric Campbell—the Harrisonburg City Manager—detailing her disagreement with the CANs, her lack of access to Rockingham County's grievance process, and the failure of the response to address any particulars of her grievances. (Thompson Letter to King and Campbell at 1.) The letter further requested that the CANs be removed from Thompson's employee file and that they not be used as any grounds for future adverse action. (*Id.* at 6.)

Six days later, Thompson was terminated, purportedly because county officials had already decided that the CSA Manager position would be eliminated once the CSA office was transferred to DSS, and not because of her CANs. (King Aff. ¶ 19; Thompson Dep. 94:11–12, 252:20.) Thompson was notified of her termination in a letter dated February 19, 2020, which also included a proposed severance package that Thompson ultimately rejected. (*Id.* ¶ 19; Termination and Severance Letter [ECF No. 41-11].) The Municipal Defendants contend that the CANs had nothing to do with Thompson's termination.

Following her termination, Thompson filed this action in Virginia state court on January 15, 2021, alleging that: Harrisonburg and Rockingham County retaliatorily fired her in

violation of the Virginia Fraud Against Taxpayers Act (Count I);[14] Harrisonburg and Rockingham County violated her federal right to procedural due process (Count II); the FES Defendants defamed her (Count III); the FES Defendants tortiously interfered with her employment (Count IV); Davidson defamed her (Count V); and Harrisonburg and Rockingham County terminated her in violation of public policy (Count VI). (*See* ECF No. 4-1.) On March 19, 2021, the case was removed to this court. (ECF No. 1.) The Municipal Defendants and the FES Defendants have since moved for summary judgment on each of Thompson's claims. (*See* ECF Nos. 40, 42.) The motions have been fully briefed by the parties, and the court heard oral argument on February 28, 2023, making the motions ripe for disposition. For the following reasons, the motions will be granted in part and denied in part.

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248–49). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (cleaned up).

---

[14] In her response, Thompson abandoned Count I of her complaint for retaliation under the Virginia Fraud Against Taxpayers Act. (Pl.'s Opp. Br. p. 35 n. 8 [ECF No. 48].)

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up). The evidence relied on must proffer "sufficient proof, in the form of admissible evidence, that could carry the burden of proof" at trial. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

## III.   ANALYSIS

### A. Thompson's Due Process Claim (Count II)

The Municipal Defendants contend that Thompson's due process claim fails because she did not have a protected property interest in her continued employment as an at-will employee. Even if she did, they contend she was not entitled to access Rockingham County's grievance procedure because she was a managerial employee who oversaw a county and city-

wide department administering over $10,000,000 in state and local funds every year. (Mun. Defs.' Mem. Supp. Summ. J. p. 14 [ECF No. 41].)

### 1. Section 1983 Due Process Standard of Law

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege facts indicating that she has been deprived of a right guaranteed by the Constitution or laws of the United States, and that this deprivation resulted from the conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (cleaned up) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

The Due Process Clause of the Fourteenth Amendment guarantees that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Am. XIV. The Due Process Clause contains both substantive and procedural components. *Compare Washington v. Glucksberg*, 521 U.S. 702, 719–21 (1997) (substantive due process), *with Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976) (procedural due process). The procedural component of the Due Process Clause prohibits states from taking actions that deprive a citizen of "liberty" or "property" interests without adequate process, which includes being afforded notice and a right to be heard. *See Mathews*, 424 U.S. at 332.

To succeed on a procedural due process claim, Thompson must show that: (1) she had a protected liberty or property interest in her continued employment; (2) the state or its agents deprived her of this interest; and (3) the process by which the deprivation occurred was

constitutionally inadequate. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). Therefore, it is only "after finding the deprivation of a protected interest" that a court will determine whether the state's procedures complied with due process. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

### 2.  Thompson's Interest in Her Continued Employment

The Municipal Defendants first contend that Thompson has not demonstrated that she had a property interest in her continued employment, principally because she was an at-will employee, as that term is understood under Virginia law. (Mun. Defs.' Mem. Supp. Summ. J. p. 15 [ECF No. 41].) The issue for the court to determine, then, is whether Thompson had a protected property interest in her employment with the CSA office that is sufficient to rebut Virginia's at-will employment presumption.

In a line of cases beginning with *Board of Regents v. Roth,* 408 U.S. 564 (1972), the Supreme Court has recognized that a state may, through its statutes, rules, and other means, confer a property interest in continued employment to its state employees. In *Roth*, the Supreme Court held that a public university's refusal to renew a teacher's contract upon the expiration of his one-year term did not implicate his due process rights because there was nothing in the university's contract, regulations, or policies that created any legitimate claim to reemployment. *Roth*, 408 U.S. at 576–78. In so holding, the Court explained that "[p]roperty interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. Indeed, in *Perry v. Sindermann*, a companion case to *Roth*, the Court relied on "existing rules or

understandings" to hold that language in a college's faculty guide, providing that "[t]he Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory. . . .," gave a professor a protected property interest even though his employment contract did not have an express tenure provision. 408 U.S. 593, 600–01 (1972). In other words, *Roth* and *Sindermann* defined property based on whether a person had a reasonable expectation in continued employment, not on the subjective importance of the job to that individual. *See* Erwin Chemerinsky, Constitutional Law: Principles and Policies (5th ed. 2017) p. 585.

In *Arnett v. Kennedy*, 416 U.S. 134 (1974), when discussing the extent to which a federal statute could create a property interest and also restrict the attendant procedures due in case of a deprivation of that interest, a plurality of the Court wrote, "While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett*, 416 U.S. at 167. But the minority position in *Arnett* became the majority rule in *Bishop v. Wood*, 426 U.S. 341 (1976). There, the Court concluded that a "permanent employee" under state law had no property interest in his employment because the district court found, as a matter of law, that the employee "held his position at the will and pleasure of the city." *Bishop*, 426 U.S. at 345.

And while the Supreme Court's subsequent holding in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), did not expressly overrule the holding in *Bishop*, the Court found that a state employee, who could only be fired for cause pursuant to a state civil service

law, had a property interest in his employment and was entitled to pre-deprivation procedures which could not be abrogated by the state. In clarifying its holding, the Court explained:

> The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures . . . 'Property' cannot be defined by the procedures provided for its deprivation . . . The right to due process 'is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'

*Loudermill*, 470 U.S. at 541 (quoting *Arnett*, 416 U.S. at 167). Accordingly, to have a property interest, "a person clearly must have more than an abstract need or desire for it. [S]he must have more than a unilateral expectation of it. [S]he must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577 (cleaned up). To demonstrate such an entitlement in the employment context, Thompson must point to "independent sources such as state law, local ordinances, and employment contracts" that create an interest in her continued employment. *Kersey v. Shipley*, 673 F.2d 730, 732 (4th Cir. 1982); *Roth*, 408 U.S. at 577; *see Beck v. City of Durham*, 129 F. Supp. 2d 844, 850 (M.D.N.C. 2000) ("The existence of a property right to continued employment must be decided under the applicable state law.").

As a general matter, an "at-will" government employee does not have a property interest in their continued employment, and, under Virginia law, an employee is presumed to be at-will unless there is evidence to the contrary. *See Jenkins v. Weatherholtz*, 909 F.2d 105, 109 (4th Cir. 1990) ("A local government employee serving 'at the will and pleasure' of the government employer has no legitimate expectancy of continued employment and thus has no protectible property interest."); *Greene v. Nat'l Head Start Ass'n*, Inc., No. 1:09cv546, 2010

WL 1779677, at *4 (E.D. Va. Apr. 30, 2010) (citing *Dray v. New Mkt. Poultry Prods., Inc.*, 518 S.E.2d 312, 313 (Va. 1999)). Rebutting the presumption requires an employee to come forward with "sufficient evidence . . . to show that the employment is for a definite, rather than an indefinite, term," including by evidence showing, for example, that an employer "could only dismiss [an] employee for cause." *Cnty. of Giles v. Wines*, 546 S.E.2d 721, 723 (Va. 2001); *see also Morris v. City of Danville*, 744 F.2d 1041, 1047 (4th Cir. 1984) ("[I]f a contract provides for termination only for good cause, the employment is not at will and does give rise to a protectible property interest") (cleaned up). Similarly, a plaintiff rebuts the at-will presumption if the "statutory and regulatory provisions and statements of policy, when read together, disclose that a non-probationary employee does not serve at the will of the agency that employs him." *Detweiler v. Com. of Va. Dep't of Rehab. Servs.*, 705 F.2d 557, 559–60 (4th Cir. 1983); *see Garraghty v. Com. of Va., Dep't of Corr.*, 52 F.3d 1274, 1281 (4th Cir. 1995) ("It is thus clear that the Virginia Personnel Act [("VPA")] creates a property right in continued public employment, for those covered by its provisions."); *Va. Dep't of Corrections v. Compton*, 623 S.E.2d 397, 406 n.9 (Va. Ct. App. 2005) (noting that the VPA, in conjunction with state grievance procedures and a human resources manual, vested non-probationary, classified employees of the Department of Corrections with a property interest in continued employment).

Here, Thompson relies on Virginia Code sections 15.2-1506 and -1507—and the County's grievance procedures adopted pursuant to those provisions—as sources of her property interest in her continued employment. Virginia Code Sections 15.2-1506 and -1507 require that localities having more than 15 employees create their own employee grievance

procedures in accordance with Virginia law, and provides that "all non-probationary local government permanent full-time and part-time employees are eligible to file grievances . . . ."[15] Va. Code Ann. §§ 15.2-1506, 1507. Importantly, Section 15.2-1507 does not maintain that non-probationary employees are "at will" (or other similar language), and draws distinctions between the rights of probationary employees and non-probationary employees. *See id.* Section 15.2-1507 also dictates which non-probationary employees are eligible to file grievances and what kinds of complaints are grievable. *See* Va. Code Ann. § 15.2-1507(A)(2), (A)(3)(a).

Adhering to these code sections, the County's grievance procedure authorizes all full-time, non-probationary employees (except for managerial employees) to file grievances as defined in the policy. (County Grievance Procedure at 2.) The County's grievance procedure consists of a four-step process, ending with a panel hearing in front of three neutral members. (*Id.* at 4–5.) The decision of the panel is "final . . . and shall be consistent with written policy and applicable law." (*Id.* at 6) Following a decision of the panel, either the County or the grievant may petition the court for an order requiring implementation of the panel's decision, making it legally binding. (*Id.*)

The court must determine whether the County's grievance procedures—and the statutory provisions giving rise to them—gave Thompson a property interest in her continued

---

[15] An employee of a locality is entitled to a grievance proceeding to resolve disputes that may arise between her and the locality as her employer. Va. Code Ann. § 15.2-1506. Disciplinary actions, including terminations, are grievable. Va. Code Ann. § 15.2-1507(A)(1). When a locality's grievance procedure provides for a final hearing before a grievance panel, the decisions of the grievance panel "shall be final and binding and shall be consistent with provisions of law and written policy." Va. Code Ann. § 15.2-1507(A)(10)(a)(6). But "[t]he question of whether the relief granted by a panel . . . is consistent with written policy shall be determined by the chief administrative officer of the local government[.]" Va. Code Ann. § 15.2-1507(A)(10)(a)(7). After the grievance panel reaches its decision, either party may petition a circuit court "for an order requiring implementation of the hearing decision." Va. Code Ann. § 15.2-1507(A)(11)*; see LaRock v. City of Norfolk*, 872 S.E.2d 432, 434 (Va. 2022) (explaining Va. Code Ann. §§ 15.2-1506–1507.)

employment. *See Smith v. Wright*, No. 2:19CV559, 2020 WL 6053154, at *7 (E.D. Va. May 6, 2020) *report and recommendation adopted*, No. 2:19CV559, 2020 WL 3568312 (E.D. Va. July 1, 2020); *Detweiler*, 705 F.2d at 559–60. Thompson relies on the holdings in *Detweiler* and *Smith* to support her argument that Virginia law gives her a cognizable property interest in her continued employment. In *Detweiler*, the Fourth Circuit analyzed Section 7:10 of the Rules for the Administration of the VPA; that section gave non-probationary employees, like the plaintiff, the right to grieve dismissals. 705 F.2d at 559–60. The Fourth Circuit found that the statutory and regulatory provisions, along with the employer's policy statements, "disclose[d] that a non-probationary employee does not serve at the will of the agency that employs him." *Id.* at 559–60. The court also reasoned that the statute's distinction between "probationary employees and non-probationary employees, . . . and the authority conferred on an impartial panel to reverse the agency's decision and to order reinstatement," established that a "non-probationary employee has a property interest in continued employment that is created by the state." *Id.* at 560; *see Garraghty*, 52 F.3d at 1281 ("It is thus clear that the [VPA] creates a property right in continued public employment, for those covered by its provisions."); *Compton*, 623 S.E.2d at 406 n.9 (noting that the VPA, in conjunction with state grievance procedures and a human resources manual, vested non-probationary classified employees of the Department of Corrections with a property interest in continued employment).

Similarly, in *Smith v. Wright*, a court in the Eastern District of Virginia held that "the [c]ity's grievance procedures, and the statutory backdrop giving rise to them, vest [plaintiff] with a property interest in his continued employment . . ." *Smith*, 2020 WL 6053154, at *7. In so holding, the court noted that the city's procedures, adopted pursuant to section 15.2-1507,

were sufficiently analogous to those addressed by the Fourth Circuit in *Detweiler*, which were deemed to create a property interest—at least for purposes of stating a plausible claim and surviving a motion to dismiss. *Id.*

Here, the County's procedures are sufficiently analogous to the provisions analyzed in *Detweiler*, and practically identical to those at issue in *Smith*. Like *Detweiler* and *Smith*, Virginia law provides that Thompson, as a full-time, non-probationary employee, was eligible to file grievances depending on if she was covered by the County's policy and if her complaints were grievable under that policy. Va. Code Ann. § 15.2-1507(A)(3)(a). And, similar to the Fourth Circuit's reasoning in *Detweiler*, the fact that Section 15.2-1507 makes distinctions between the rights of non-probationary and probationary employees—and between disciplinary discharges and discharges for reduction in work force—indicates that those non-probationary employees who were disciplinarily discharged have a higher degree of job security than those who were not. *See Detweiler*, 705 F.2d at 560. In other words, Virginia has created a property interest for non-probationary, full-time government employees, insofar as they cannot be terminated without being afforded a mandatory grievance process.

In resisting this conclusion, the Municipal Defendants rely on *Smith v. School Board for City of Norfolk, Virginia*, No. 2:21-CV-138, 2021 WL 5163312 (E.D. Va. Nov. 5, 2021), and *County of Giles v. Wines*, 546 S.E.2d 721 (Va. 2001), but both cases are distinguishable. In *Smith v. School Board*, a public-school employee brought a procedural due process claim after she was terminated for misappropriating funds. 2021 WL 5163312, at *3. In determining that the employee did not have a property interest in her continued employment, the court analyzed the employee's employment contract and the school board's grievance procedures. *Id.* at 16.

- 22 -

Ultimately, the court explained that the employee's contract did not expressly state that she could be fired only for cause, and that the school board's policies applied similar language, stating that permanent employees "*may* be discharged . . . .," which implied that the employee's employment was at-will. *Id.* at 17. As such, the court held that the employee did not have a protected property interest in her continued employment. *Id.*

Similarly, in *County of Giles*, a public employee alleged that a county's personnel policy gave him a property interest in his continued employment. 546 S.E.2d at 724–25. Analyzing the employee's contract and county's personnel policy, the court concluded that the language cited by the plaintiff stated that an "employee *may* be discharged for inefficiency, insubordination, misconduct, or other just cause," indicating that his employment was at-will. *Id.* at 723. As such, the court found that the plaintiff did not rebut the at-will presumption.

But here, contrary to both *Smith v. School Board* and *County of Giles v. Wines*, it is the Virginia statute that gives rise to the grievance procedure outlined in the County's handbook, not the policy manual or contract itself. Moreover, the statute at issue does not provide that the distinctions it makes between non-probationary employees and probationary employees are of no consequence. To the contrary, the plain language of the statute states that, "[u]nless otherwise provided by law, all nonprobationary local government permanent full-time and part-time employees are eligible to file grievances." Va. Code Ann. § 15.2-1507(A)(3)(a). Indeed, to read Section 15.2-1507's requirement that localities establish grievance procedures *for certain employee's* as not creating a protected interest would render Section 15.2-1507 effectively meaningless. The County could, as it did here, refuse to provide a grievance process and leave an employee without recourse despite reasonable expectations that employee may

have had with respect to her continued employment—at a minimum, the right to be heard prior to her termination for a grievable reason.

In sum, the court concludes that the County's grievance procedures—and the unique state statutory regime giving rise to these procedures—provide an adequate foundation for Thompson's legitimate expectations regarding her continued employment with the County. Indeed, it is these expectations that vest Thompson with a cognizable property interest, such that her employment could not be arbitrarily terminated without being provided notice and an opportunity to be heard through the County's grievance procedure.

But the proposition that Virginia state employees are entitled to grievance proceedings is, of course, limited to *grievable* employment actions. *See Mandel v. Allen*, 81 F.3d 478, 481 (4th Cir. 1996) (noting that "no property right inheres when employees are dismissed for nongrievable circumstances such as reduction in work force or job abolition." (cleaned up)). Accordingly, this claim can only proceed to trial if a reasonable jury could find that Thompson's termination was grievable, as will be discussed below.

### 3.  The Manager Exception and the Circumstances of Thompson's Termination

The Municipal Defendant's contend that, even if Thompson had a protected interest in her continued employment, the County's grievance procedure was unavailable to her because of her status as a manager; or, in the alternative, if Thompson was a lower-level manager, because her position was eliminated through restructuring, rather than as the result of a disciplinary process. (Mun. Defs.' Mem. Supp. Summ. J. p. 16–18 [ECF No. 41].) The Municipal Defendants point to the language of the County Grievance policy:

- 24 -

> The grievance procedure is available to all employees of the Harrisonburg Social Services District except probationary, temporary and emergency employees; and is available to all employees of the County except: . . . (4) managerial employees who, as a function of their job, are engaged in county-wide policy determinations, unless for a lower[-]level managerial employee, the case involves dismissal as the disciplinary action, in which case, the employee may use the grievance procedure.

(County Grievance Procedure at 2.) As such, the court must determine if there are genuine disputes of material fact as to whether Thompson was a lower-level manager and, if so, whether her position was eliminated due to restructuring or disciplinary action.

### i.  Manager Exception

After a thorough review of the record, the court finds that there is a genuine factual dispute as to whether Thompson was a manager who engaged in county-wide policy determinations. On one hand, when advocating for her promotion to CSA Manager, Thompson explained that she "created a local policy and procedural manual for use by member agencies seeking funding through the [CSA] office," and that she "was one of the co-writers for the Harrisonburg Rockingham Purchased Services Standards manual." (Promotion Email Chain at 3.) Thompson explained that she "successfully argued to expand the size of the office to include three staff members . . . enabling [her] to be more strategic and identify opportunities to further improve CSA." (*Id.*) Moreover, once Thompson was promoted to CSA Manager, her duties included supervising three employees and a budget exceeding $10,000,000. (King Aff. ¶ 7; CSA Manager Job Description.)

On the other hand, Thompson testified that she did not create policy because that was the CPMT's responsibility. (Thompson Dep. 19:21–20:8; 223:15–18; 224:22–25.) Davidson essentially conceded as much, testifying that Thompson would recommend policy to the

CPMT, but CPMT's approval was required to implement those recommendations. (Davidson Dep. 30:19–32:11.) Thompson was also not authorized to approve or deny vendor payments, as that was within the province of the FAPT. (Thompson Dep. 51:12–19.) Instead, the CSA office was responsible for ensuring that the correct services were being provided. (*Id.* 51:20–52:2.) As such, it is arguable that Thompson did not have the unilateral authority to create policy or make substantive decisions regarding payment to vendors.

The organizational interplay between the CSA office, the FAPT, and CPMT also gives rise to material factual disputes. Virginia law provides that the CPMT establishes policies governing the referral of troubled youth and families to the local FAPT. Va. Code Ann. § 2.2-5209. The FAPT then assesses the strengths and needs of those youth who are approved for referral, identifies and determines the services required to meet their needs, develops plans to provide appropriate services, and recommends to the CPMT expenditures from the state pool of funds. Va. Code Ann. § 2.2.-5208.

As the CSA Manager, Thompson was ostensibly subordinate to both the FAPT and CPMT with respect to crafting policy and making substantive decisions regarding the allocation of funds and services.[16] Instead, the CSA office would ensure that the services approved by the FAPT were correct for compliance purposes. (Thompson Dep. 51:20–52:13.) Once the FAPT met and approved services for youth and families to be rendered by a particular vendor, Thompson would oversee the CSA office's generation of a purchase order,

---

[16] While Thompson was, at one time, the "facilitator" of the FAPT (Thompson Dep. 191:5–6), Davidson decided to remove Thompson from the FAPT meetings in November of 2018. (Davidson Dep. 55:20–22; Thompson Dep. 167:19–23.) As such, Thompson may have only had an intermittent voice in FAPT meetings where services and funding would be discussed.

which was then sent to the DSS for review, approval, and signature by the requisite social worker and supervisor. (*Id.* 90:2–15, 109:6–17; Tanner Decl. ¶¶ 6–10.) After reviewing and signing the invoice, the DSS would return it to the CSA office, where Tanner would put the date of receipt on the unfiled vendor report; Thompson reviewed, approved, and dated the invoice, and then placed it in a box where it would be picked up by County finance office staff who were responsible for making payment. (*Id.* 109:12–17, 111:17–25.) Moreover, the three staff members Thompson supervised were clerical employees.

Taking these facts together, a reasonable jury could believe that Thompson was a lower-level manager who was merely responsible for compliance with the CSA. Accordingly, there is a genuine dispute of material fact as to whether Thompson was a manager who engaged in county-wide policy determinations, or whether she was a lower-level manager who did not.

### ii. Circumstances of Thompson's Termination

As to the final part of the Municipal Defendants' argument, the court concludes that genuine disputes of fact exist with respect to the circumstances of Thompson's departure.

A thorough review of the record indicates that Thompson's supervisors first considered transferring the CSA office from the city/county to DSS in late 2019. (Davidson Dep. 90:5–18; King Aff. ¶ 16.) Indeed, from late 2019 until the move was finally approved on January 23, 2020, Davidson apparently had multiple discussions with Williams, the DSS Director, regarding a consolidation and the amount of money it would save Harrisonburg and the County. (*Id.* 90:5–92:9, 100:21–101:21; *see* Williams Jan. 3, 2020 Email to Davidson.) And the move did, in fact, save Harrisonburg and Rockingham County money. By moving the CSA

office back under the aegis of the DSS, the CSA program was able to take advantage of federal and state reimbursements for approximately 85% of CSA salaries, subsidies that would have been unavailable if the employees were supervised by Rockingham County. (King Aff. ¶ 16.) In total, the reorganization saved Rockingham County and Harrisonburg approximately $158,222 per year. (*Id.*)

But a fair reading of the record also suggests that Thompson's superiors sought to remove her from the CSA office for alleged performance-based reasons. As such, the "restructuring" of the CSA office and the elimination of the CSA Manager position could be viewed as a pretext for Thompson's termination—or simply a fortuitous, but unrelated, coincidence, from Defendants' perspective. Indeed, discussions concerning the reorganization of the CSA office began in late 2019 when Davidson also began "having some real issues, serious issues, like every month," with Thompson. (Davidson Dep. 134:1–5.) These issues even prompted Davidson to pull Thompson's personnel file so that she could compile a list of instances, going back several years, "where [Davidson] had to correct or redirect" Thompson's conduct, which she emailed to Banks on November 6, 2019. (Davidson's Nov. 6, 2019 Email to Banks; Davidson Dep. 133:20–134:8.) Davidson's email stated that "[t]he number of instances that [Thompson] requires redirection, coaching, reminding . . . seems like quite a bit for a manager position." (*Id.*) And at the conclusion of the email, Davidson added that "[Thompson] has not done a good job at movement [*sic*] the dial forward" in her job as CSA manager. (*Id.*)

Moreover, on January 2, 2020, well-before the reorganization was finalized, King sent an email to Banks stating, "I'm convinced that we should eliminate the CSA Manager position

and move the CSA operation back to the DSS building, with daily oversight to be provided by the Director of Social Services . . . *We have a supervisor who has consistently demonstrated an unwillingness or inability to improve.*" (King's Jan. 2, 2020 Email to Banks (emphasis added).) Also on January 2, Davidson emailed Banks, "[King] wants [Banks] and [Campbell] to be on board if/when the time comes to make a change." (Davidson's Jan. 2, 2020 Email Chain at 1.) And although Davidson testified that no decision was made regarding Thompson's future at the time she sent the email (Davidson Dep. 146:12–14), Mongold's subsequent correspondence with Davidson suggests that Thompson's removal was already in motion. Specifically, Mongold advised Davidson in an email, "*[I]t should probably be added that none of the initiatives that [Thompson] was tasked with in becoming a manager took place—more reasoning to support that we don't need a manager level position.*" (Mongold's Jan. 3, 2020 Email to Davidson at 3 (emphasis added).) These email correspondences, in the mind of a juror, could demonstrate that Thompson's superiors wanted to remove her from the CSA office and that they were in the process of justifying their future decision in tandem with the impending reorganization.

Finally, the timing of the reorganization with respect to Thompson's CANs also creates genuine disputes of material fact. Thompson testified that she never received a written or verbal warning in her 15 years of employment with the CSA office until January of 2020, when she received two CANs, a little more than 10 days apart. (Thompson Dep. 150:4–12; CANs.) When Thompson met with Davidson and King on January 21, 2020 to discuss both CANs, Thompson was told that the CSA office would be moved to DSS and that such a move would not include her. (Davidson's Jan. 21, 2020 Email to King; Thompson Dep. 84:18–85:19; King's Jan. 22, 2020 Email to Mongold.) The reorganization was approved two days later. (*See*

Administrative Board Minutes.) And although discussions regarding reorganization had apparently been occurring for quite some time, Davidson purportedly told Tanner that the CSA transition to DSS had to be moved up by six months (Tanner Decl. ¶ 23), after Thompson began disputing her CANs.

Accordingly, a reasonable jury could be persuaded that Thompson was terminated for disciplinary reasons and not incidentally because of the CSA office's reorganization. This material factual dispute precludes entry of summary judgment.

### 4. Due Process Conclusion

In sum, the court finds that Thompson maintained a property interest in her continued employment with the CSA office. Therefore, Thompson was entitled to due process before that interest could be deprived, but only if a jury could believe that she was covered by the County's grievance procedure. Because Thompson has presented material facts on which she could persuade a reasonable factfinder that she was a lower-level manager and that she was terminated for purported disciplinary reasons (both of which bring her within the grievance procedure's coverage), the court will deny summary judgment on Count II.

### B. Thompson's Defamation Claims (Counts III & V)

In Virginia, claims of defamation involve three elements: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Sanders*, 737 S.E.2d 890, 892 (Va. 2013). To be actionable, a statement must be both false and defamatory. *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (cleaned up). Whether a statement is actionable is a question of law. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Defamation claims may be defeated by an appropriate assertion of privilege which, in turn, may be overcome if

the plaintiff proves that the privilege has been lost or abused. *Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013). The existence of a qualified privilege is a question of law, but whether a defendant has lost or abused that privilege is a question of fact. *Id.*

Thompson contends that Clatterbuck defamed her seven times during her January 16, 2020 meeting with Davidson: 1) Clatterbuck's statement that "FES was having issues regarding not getting paid in a timely manner for services performed for the CSA Office"; 2) when Davidson offered to have Thompson speak with them about these issues, Clatterbuck said "she could not handle the stress of facing [Thompson]," and further stated that "there is a history with the CSA Office that [Clatterbuck] did not want to deal with at the moment"; 3) Clatterbuck's statements that "the CSA Office owes her more than $40,000 for November and December and [Clatterbuck] needs the money to pay bills," and that "[Clatterbuck] has emailed CSA asking about the status of her invoices and did not receive a response"; 4) Clatterbuck's statement that, "in her experience, if [Thompson] likes the vendor they get paid timely, if she doesn't like the vendor, they have to wait for their money"; 5) Clatterbuck's statements that "often times she hears from FAPT members that anytime FES is brought up in a FAPT meeting, [Thompson] has disrespectful and unprofessional comments to make about their services," that "[Thompson] will say 'Why would you use them?' referring to FES," and that Clatterbuck stated "many years ago she spoke to Ann Lewis (former assistant city manager for Harrisonburg) about the issues and nothing was resolved"; 6) Clatterbuck's statement that "the time difference in which FAPT approves a service and CSA provides the invoice is detrimental to the kid's well-being"; and 7) Clatterbuck's statements that "she does not have confidence that what [Thompson] says to her is the whole truth," and that

"[Clatterbuck] is retiring because of the stress of dealing with the CSA Office." (Compl. ¶ 41;
Pl.'s Resp. to Clatterbuck and FES's Interrog. No. 13.)

Thompson contends that these statements, and Davidson's republication of them,
constituted defamation. Both the FES and Municipal Defendants counter that Clatterbuck's
initial statements and Davidson's subsequent republication of them are not actionable or, in
the alternative, are subject to a qualified privilege. As such, the court will address these
challenges in turn.

### 1. Actionability of The Statements

Defendants first argue that the statements are not actionable, either because they were
true or were statements of opinion.

As noted previously, "[a]n actionable statement is both false and defamatory." *Schaecher*,
772 S.E.2d at 594. "Defamatory words are those 'tend[ing] so to harm the reputation of
another as to lower him in the estimation of the community or to deter third persons from
associating or dealing with him.'" *Id.* (quoting Restatement (Second) of Torts § 559 (Am. L.
Inst. 1977)). "A false statement must have the requisite defamatory 'sting' to one's reputation."
*Id.* "Characterizing the level of harm to one's reputation required for defamatory 'sting,'" the
Supreme Court of Virginia has "stated that defamatory language 'tends to injure one's
reputation in the common estimation of mankind, to throw contumely, shame, or disgrace
upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated
to render him infamous, odious, or ridiculous.'" *Id.* (quoting *Moss v. Harwood*, 46 S.E. 385, 387
(Va. 1904)). Additionally, "[a] defamatory statement may be made 'by inference, implication
or insinuation.'" *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003) (quoting

*Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 592 (Va. 1954)). And a statement is defamatory *per se* if it, among other things, "imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of the duties; or prejudices the party in her profession or trade." *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 138 n. 2 (1998) (citing *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981)).

But it is well-settled that expressions of pure opinion are not actionable as defamation. *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011). "When a statement is relative in nature and depends largely on a speaker's viewpoint, that statement is an expression of opinion." *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (Va. 2009). While "pure expressions of opinion" cannot ordinarily form the basis of a defamation claim, "factual statements made to support or justify an opinion can." *WJLA-TV v. Levin*, 564 S.E.2d 383, 392 (Va. 2002) (cleaned up). Accordingly, statements that are verifiably false or contain "provably false factual connotations" may be defamatory. *Id.*; *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990) (holding that a statement that implies a false assertion of fact may be actionable even if it is couched as a statement of opinion). The issue of whether a statement is opinion or fact is determined by the court as a matter of law, as is the issue of whether a statement is defamatory. *See Yeagle*, 497 S.E.2d at 138; *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985).

In determining whether a statement is one of fact or opinion, the court must consider the statement as a whole, rather than isolating one portion of the statement from another. *Hyland*, 670 S.E.2d at 751. Because all of Clatterbuck's statements were made in the same meeting with Davidson on January 16, 2020, her statements must be considered in context—that is, together and not separately.

- 33 -

The court concludes that Clatterbuck's first, third, and fourth sets of statements are actionable as defamation *per se*. Clatterbuck's first statement, that "FES was having issues regarding not getting paid in a timely manner for services performed for the CSA office," is an actionable statement. This statement implicates Thompson, even though she is not directly mentioned in the statement, because she was the manager of the CSA office. Because Thompson would have been responsible for any invoice related issues which may have caused the lack of payment to issue to FES, the statement also implies that Thompson was unfit to perform the duties of her job and is defamatory *per se*. Moreover, whether FES was having issues getting paid for services it performed is capable of being proven true or false, and there is a genuine dispute of material fact regarding the truth or falsity of the statement. As such, this statement is actionable as defamation *per se*.

Clatterbuck's second set of statements, that "she could not handle the stress of facing [Thompson]," and that "there is a history with the CSA office that [Clatterbuck] did not want to deal with at the moment," are statements of opinion. These are relative statements and depend largely on Clatterbuck's perspective. The statements are also not capable of being proven false. As such, these statements are mere opinion and not actionable.

Clatterbuck's third set of statements, that "the CSA Office owes her more than $40,000 for November and December and [Clatterbuck] needs the money to pay bills," and that "[Clatterbuck] has emailed CSA asking about the status of her invoices and did not receive a response," are also actionable statements. These statements are easily attributable to Thompson and impugn her ability to perform her job because the statements imply that Thompson was improperly withholding payments that were owed to FES.

There are also genuine disputes of fact as to whether FES was "owed" more than $40,000, whether Clatterbuck needed the money "to pay her bills," and whether the CSA office was unresponsive to emails. As discussed, FES may have not submitted the appropriate paperwork at the appropriate time and, therefore, would not be "owed" anything. Although Davidson contends that FES *was* owed $40,000 (Davidson Dep. 186:17–25), Tanner contends that the CSA office first saw the appropriate invoices on January 24, 2020, when Davidson dropped them off at Tanner's desk. (Tanner Decl.¶ 17.)

A reasonable jury could also conclude that Clatterbuck was not being truthful to Thompson's boss when she asserted that the CSA office was unresponsive to FES's emails. Tanner avers that she was in contact with Sarah Arey regarding the outstanding invoices, sent her an email on January 8, 2020, and spoke with Clatterbuck about the issue one week later, right before she met with Davidson. (Tanner Decl. ¶¶ 9, 13–14; Tanner's Jan. 8, 2020 Email to Sarah Arey.) As such, the third set of statements is actionable as defamation *per se*.

Clatterbuck's fourth statement, that "in her experience, if [Thompson] likes the vendor they get paid timely, if she doesn't like the vendor, they have to wait for their money," is also an actionable statement. Again, these statements clearly reference Thompson, impugn her fitness to perform her job by alleging that she is biased toward—or against—certain vendors, and are capable of being proven false. Depending on the evidence adduced at trial, a reasonable jury might believe that Thompson did, at times, delay payment to vendors that she did not like, but, depending on the evidence, it could also conclude that this claim was untrue. As such, this statement is actionable as defamation *per se*.

- 35 -

Clatterbuck's fifth set of statements, that "often times she hears from FAPT members that anytime FES is brought up in a FAPT meeting, [Thompson] has disrespectful and unprofessional comments to make about their services," that "[Thompson] will say 'Why would you use them?' referring to FES," and that Clatterbuck stated "many years ago she spoke to Ann Lewis (former assistant city manager for Harrisonburg) about the issues and nothing was resolved," are statements of opinion. These are relative statements and depend largely on Clatterbuck's perspective and state of mind. Moreover, the statements are not capable of being proven false. Accordingly, these statements are opinion and not actionable.

Clatterbuck's sixth statement, that "the time difference in which FAPT approves a service and CSA provides the invoice is detrimental to the kid's well-being," is likewise a statement of opinion; what Clatterbuck views as detrimental may not be what Thompson, the FAPT, or CPMT view as detrimental. Moreover, the statement is not capable of being proven false. As such, this statement is mere opinion and not actionable.

Finally, Clatterbuck's seventh set of statements, that "she does not have confidence that what [Thompson] says to her is the whole truth," and that "[Clatterbuck] is retiring because of the stress of dealing with the CSA Office," are also statements of opinion. These statements are relative in nature and depend largely on Clatterbuck's perspective. Moreover, the statements are not capable of being proven false. As such, these statements are mere opinion and not actionable.

Accordingly, the court finds that Clatterbuck's first, third, and fourth sets of statements are actionable as defamation *per se*.

- 36 -

### 2.  Qualified Privilege and Requisite Intent

Even if some of the above statements are defamatory, Defendants nevertheless contend that they are subject to a qualified privilege. Additionally, the FES Defendants argue that Clatterbuck lacked the requisite intent to defame Thompson, principally because Thompson was a public figure in her capacity as CSA Manager.

"The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought." *Jordan v. Kollman*, 612 S.E.2d 203, 207 (Va. 2005). "The requisite intent for defamation involving a private person is essentially negligence—that the defendant 'either knew [the statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based.'" *Ransome v. O'Bier*, No., 2017 WL 1437100, at *4 (E.D. Va. Apr. 20, 2017) (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725 (Va. 1985)). If a plaintiff is a public figure, she must prove, by clear and convincing evidence, that the defendant acted with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 354, 279–80 (1964); *Gertz v. Robert Welch*, 418 U.S. 323, 342 (1974).

As noted above, defamation claims may be defeated by an appropriate assertion of privilege which, in turn, may be overcome if the plaintiff proves that the privilege has been lost or abused. *Cashion*, 749 S.E.2d at 532. A "qualified privilege attaches to 'communications between persons on a subject in which the persons have an interest or a duty.'" *Id.* (quoting *Larimore v. Blaylock*, 528 S.E.2d 119, 121 (Va. 2000)). "Once a qualified privilege has attached to a communication, the plaintiff has the burden to prove that the privilege has been lost or

abused, which must be shown by clear and convincing proof." *Id.* The privilege is lost or abused if any one of the following is shown by clear and convincing evidence:

> (1) the statements were made with knowledge that they were false or with reckless disregard for their truth; (2) the statements were communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will; (4) the statements included strong or violent language disproportionate to the occasion; or (5) the statements were not made in good faith.

*Id.* at 533 (cleaned up) (collecting cases). The existence of a qualified privilege is a question of law for the court, but whether a defendant has lost or abused that privilege is a question of fact for the jury. *Id.* at 532.

### i.   Clatterbuck's Qualified Privilege and Intent Challenge

The FES Defendants argue that Clatterbuck did not have the requisite intent to defame Thompson, who they argue was a public figure, and that Clatterbuck's statements were qualifiedly privileged.

As an initial matter, contrary to the FES Defendants' argument, Thompson is not a public figure, nor is she engaged in a matter of public concern or otherwise known to the public. She is, at most, a mid-level civil servant in a small government office who supervised three clerical employees. *See Hutchinson v. Proximire*, 443 U.S. 111, 114, 135 (1979) (holding that a director of research at a university hospital was not a public figure, noting that his "activities and public profile are much like those of countless members of his profession."); *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 37 (Va. 1987) (holding that a public-school teacher and department head was not a public official; although she was on the government payroll, there was no showing that she, "who was not an elected official, either influenced or even

appeared to influence or control any public affairs or school policy."); *Fleming*, 275 S.E.2d at 637 (finding that a state university professor "did not occupy a position of 'such persuasive power and influence' that he could be deemed a public figure 'for all purposes.'"); *Penland v. Long*, 922 F. Supp. 1085, 1091 (W.D.N.C. 1996), *rev'd on other grounds sub nom. Jackson v. Long*, 102 F.3d 722 (4th Cir. 1996) (holding that a shift supervisor at county jail did not "have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."). As such, Thompson is unquestionably a private figure and "the requisite intent for defamation . . . is essentially negligence—that the defendant 'either knew [the statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based.'" *Ransome*, 2017 WL 1437100, at *4 (quoting *Harris*, 325 S.E.2d at 725).

But even though the burden of proof is essentially negligence, the FES Defendants assert that Clatterbuck's statements were qualifiedly privileged. The qualified privilege does not attach to Clatterbuck's statements made in her January 16, 2020 meeting with Davidson, however, because Clatterbuck was not an intraorganizational employee and her defamatory comments were not related to an employment matter.

While Virginia recognizes that a qualified privilege attaches to communications between people on a subject in which they have a duty or interest, *Cashion*, 749 S.E.2d at 532, Virginia courts do not typically apply this privilege in circumstances like those presented here. Instead, "the overwhelming majority of qualified privilege cases founded on the foregoing general principles deal with intra-organizational immunity." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 662 (E.D. Va. 2015); *see e.g., Mann v. Heckler & Koch Def., Inc.,* 639 F. Supp.

2d 619, 636 (E.D.Va.2009), *aff'd,* 630 F.3d 338 (4th Cir. 2010); *Kuley v. Fayez,* 89 Va. Cir. 238, 2014 WL 10190138 (2014) ("The genesis of the qualified privilege doctrine in Virginia came largely from a series of cases [about communications made to a business associate in the ordinary course of business]. These cases established the privilege as a common-law doctrine in the Commonwealth"); *Blaylock,* 528 S.E.2d at 121–23 (holding that defamatory comments made in the tenure review process were qualifiedly privileged); *Southeastern Tidewater Opportunity Project, Inc. v. Bade,* 435 S.E.2d 131 (Va. 1993) (holding that qualified privilege attached to a termination letter of an employee); *Oberbroeckling v. Lyle,* 362 S.E.2d 682 (Va. 1987) (evaluating whether malice was sufficiently demonstrated to rebut qualified privilege asserted regarding a letter accusing an employee of mismanagement of funds); *Chalkley v. Atlantic Coast Line R.R. Co.,* 143 S.E. 631, 632 (Va. 1928) (holding that a defamatory statement made to a fellow employee-typist was qualifiedly privileged).

While Davidson and Clatterbuck may have shared a common interest in vendors being paid in a timely manner, that interest is not the type of intraorganizational common interest recognized by Virginia qualified privilege jurisprudence. The FES Defendant's offer no appropriate case law[17] on the matter and, because Virginia courts have not explicitly extended

---

[17] The court, however, did find one Virginia Supreme Court case applying qualified privilege to an extra-organizational actor, but it is distinguishable. In *Smalls v. Wright,* a police officer sued a woman for defamation after she wrote a letter to the police chief, attempting to register "an official complaint" about the officer's allegedly discriminatory conduct. 399 S.E.2d 805, 806–07 (Va. 1991). The Virginia Supreme Court found that the defendant's statements contained in the letter were qualifiedly privileged because both she and the police chief had corresponding interests in the subject of the letter. *Id.* at 807. But unlike the defendant in *Smalls,* Clatterbuck did not register "an official complaint," and there is no statutory or common law right for her to have done so. *See id.* ("A citizen has the right to make a citizen's complaint about a police officer's misconduct."). Moreover, the fact that almost every case cited in *Smalls's* short and conclusory analysis has been overruled suggests that *Smalls* itself is no longer good law or, at a minimum, cannot be relied on given the dearth of analysis and the strong suggestion that the bases for its decision are no longer recognized as controlling precedent.

application of qualified privilege to extra-organizational communications, the court declines to apply that doctrine here. Therefore, as a matter of law, Clatterbuck's statements to Davidson are not insulated by the qualified privilege.

As such, Thompson must convince a jury that when Clatterbuck made the statements to Davidson, she knew that her statements were false; or believing them to be true, lacked reasonable grounds for such a belief; or acted negligently in failing to ascertain the facts on which the publication was based. And based on the detailed facts discussed throughout this Opinion, a reasonable jury could find that Clatterbuck defamed Thompson with negligent intent.

Accordingly, the FES Defendants' motion is denied as to Count III.

### ii. Davidson's Qualified Privilege

The Municipal Defendants also argue that Davidson's republication of Clatterbuck's statements is subject to a qualified privilege. The court agrees.

The qualified privilege attached to Davidson's communications because she only shared them with individuals who maintained a reciprocal interest or a duty in their subject. After hearing Clatterbuck's statements on January 16, 2020, Davidson republished those statements to King, Banks, and Tanner, all of whom—as explained below—had an interest or duty relating to the subject matter of Clatterbuck's statements. *See Cashion*, 749 S.E.2d at 532.

Davidson was charged by King to improve "the level of professionalism and customer service by the CSA office," and was to "keep [him] informed about those efforts." (King Aff. ¶ 11.) As Thompson's direct supervisor, Davidson had a duty to report Clatterbuck's

statements to King because they concerned the level of professionalism and customer service provided by the CSA office. (*Id.*)

Banks and Tanner likewise had an interest in the subject matter of Clatterbuck's statements. Banks was the CPMT co-chair with Davidson and was in the meeting with Thompson to discuss her CANs, which included Clatterbuck's defamatory statements. Tanner was Thompson's immediate subordinate and handled a large part of the clerical duties to which Clatterbuck referred. Davidson had a duty to speak to other CSA staff, including Tanner, to verify the validity of Clatterbuck's complaints. (*Id.*) And Tanner would have had intimate knowledge of the circumstances surrounding Clatterbuck's complaints by virtue of her work responsibilities and her previous interactions with FES employees on the matter.

Finally, this is the typical intra-organizational employment scenario in which Virginia courts apply the qualified privilege. *See, e.g.*, *Blaylock*, 528 S.E.2d at 122 ("[E]mployment matters are occasions of privilege in which the absence of malice is presumed."); *Cashion*, 749 S.E.2d at 532 (finding that statements made between doctors in an operating room concerning patient care were qualifiedly privileged); *Mann*, 636 F. Supp. 2d at 636 (holding that intra-corporate communication sent to six employees informing them of plaintiff's absence was qualifiedly privileged).

But Thompson argues that Davidson abused this privilege, contending that Davidson republished Clatterbuck's statements with malicious intent. (Pl.'s Opp. Br. at 24 [ECF No. 48].) As noted previously, clear and convincing proof of malicious intent will defeat an assertion of qualified privilege. *Cashion*, 749 S.E.2d at 532–33.

Here, while Davidson claims she had observed Thompson make rude comments in the past, disparage vendors at FAPT meetings, investigated the amount of money FES was allegedly owed, and spoke with other relevant parties on the matter, other evidence in the record suggests that Davidson may have acted with malicious intent, or was motivated by personal spite or ill will. For example, "at some point after learning Ms. Clatterbuck's contention[s]" in her statements to Davidson, Tanner testified that she told Davidson that the CSA office "had not received back invoices from FES for the great majority of encumbered funds for services approved for the November 2019 time-period." (Tanner Decl. ¶ 16.) She also testified that she told Davidson "about the invoices [she] had received [on January 8, 2020] from FES for December 2019 services." (*Id.* (cleaned up).) And Davidson allegedly told Tanner that "she knew that . . . the CSA office would not withhold payments to vendors as had been alleged by Ms. Clatterbuck." (*Id.* ¶ 22.) Moreover, the fact that Tanner, who was largely responsible for tracking the invoices at issue, was never disciplined for "withholding payments to vendors or for any matter relating to the FES invoices"—while Thompson was— may suggest that Davidson was targeting Thompson. (*Id.* ¶ 20.)

While there may be various factual disputes regarding the ultimate truth of the republished statements, taking the evidence together, a reasonable jury could conclude that Davidson lost or abused her qualified privilege by republishing Clatterbuck's statements with malicious intent or ill will towards her subordinate. Ultimately, this is a factual question for the jury, not the court; thus, the Municipal Defendants' motion is denied with respect to Count V.

### C. Thompson's Tortious Interference Claim (Count IV)

The FES Defendant's contend that Clatterbuck did not act with the requisite intent to tortiously interfere with Thompson's employment. To establish a prima facie case of tortious interference with a business relationship, Thompson must demonstrate:

> (1) the existence of a contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the business expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). If a contract is terminable at will or involves only a contract or business expectancy, "a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference . . ., but also that the defendant employed improper methods."[18] *Dunn, McCormack & MacPherson,* 708 S.E.2d at 870 (cleaned up) (quoting *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987)); *see also Preferred Sys. Solutions, Inc. v. GP Consulting,* LLC,732 S.E.2d 676, 688 (Va. 2012); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378–79 (Va. 1997).

Here, and based on the court's previous determinations in this Opinion, elements one, two, and four are not in genuine dispute. Thompson had an expectancy in her continued employment, Clatterbuck knew Thompson maintained a business relationship with the

---

[18] "Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). Improper methods may include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011) (cleaned up). Methods may also be improper if "they violate an established standard of a trade or profession, or involve unethical conduct[, s]harp dealing, overreaching, or unfair competition." *Id.* (cleaned up).

- 44 -

County, and Clatterbuck's statements to Davidson may have been the *casus belli* for Thompson's termination. Moreover, as discussed *supra*, a reasonable jury could believe that Clatterbuck used improper methods by making defamatory statements to Davidson. The court, therefore, must determine whether a reasonable jury could find that Clatterbuck acted with the requisite intent to interfere with Thompson's employment.

On one hand, Clatterbuck and Davidson both testified that Clatterbuck's purpose in meeting with Davidson on January 16, 2020, was solely "to get paid." Clatterbuck testified that she "didn't want anything to happen to anyone," and that she simply wanted to get paid for the services rendered by FES. (Clatterbuck Dep. 93:16–19.) Davidson also corroborates this testimony, noting that "[Clatterbuck] was very apologetic for coming in the office, but she was very stressed out and just worried that she was not going to be able to pay her bills." (Davidson Dep. 172:3–15.) She also testified that Clatterbuck "did not want [Thompson] to get in trouble," and that "[Clatterbuck] just wanted her money." (*Id.*)

But Thompson argues that the defamatory statements made by Clatterbuck "evince deceit and unethical conduct," which demonstrates the requisite intent to interfere with Thompson's employment. (Pl.'s Opp. Br. p. 24 [ECF No. 47].) The court agrees. While Davidson and Clatterbuck both testified that Clatterbuck's motivations were purely pecuniary in nature, the statements, viewed in context, suggest that she may have had another purpose in mind. Viewed in the light most favorable to Thompson, the record demonstrates that Clatterbuck harbored animus for Thompson and viewed her as the reason why FES struggled to receive payment for its services. Most importantly, during Clatterbuck's meeting with Davidson, she made troubling accusations and cast aspersions that arguably went well beyond

the scope of her ostensible purpose—*i.e.*, getting paid. Indeed, Clatterbuck's statements that "there is a history with the CSA office that [Clatterbuck] did not want to deal with," that Thompson makes disrespectful comments about FES at FAPT meetings, and that Clatterbuck does not believe that "what Thompson says to [Clatterbuck] is the whole truth," all suggest that Clatterbuck did not like Thompson and that, perhaps, she wanted more. And a reasonable factfinder might also seize on the fact that Clatterbuck bypassed Thompson entirely, going out of her way to make these serious claims with her supervisor, despite being offered to speak with Thompson.

In sum, ample evidence suggests that Clatterbuck may have had ulterior motives. Accordingly, the court will deny the FES Defendants' motion as to Count IV.

### D. Thompson's *Bowman* Claim (Count VI)

The Municipal Defendants argue that Thompson has failed to establish an actionable *Bowman* claim for wrongful discharge in violation of public policy.

*Bowman* claims stem from the Virginia Supreme Court's decision in *Bowman v. State Bank of Keysville,* 331 S.E.2d 797 (Va. 1985), in which that court first recognized an exception to the employment at-will doctrine where an employee's termination violated state public policy. *See Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 710 (Va. 2002). In cases dealing with *Bowman*-type exceptions to the employment at-will doctrine, however, Virginia courts have consistently characterized these exceptions as "narrow." *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 796 S.E.2d 188, 190 (Va. 2017); *see Rowan*, 559 S.E.2d at 711 ("While virtually every statute expresses a public policy of some sort . . . termination of an employee in violation of the policy underlying any one statute does not automatically give rise to a common law cause

of action for wrongful discharge." (cleaned up) (quoting *City of Virginia Beach v. Harris,* 523 S.E.2d 239, 245 (Va. 2000)).

Accordingly, there are only three circumstances in which an at-will employee may establish that her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy;" or (3) "where the discharge was based on the employee's refusal to engage in a criminal act." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 221 (4th Cir. 2015) (quoting *Rowen,* 263 Va. at 209); *see also Dunn v. Millirons*, 176 F. Supp. 3d 591 (W.D. Va. 2016), *aff'd*, No. 16-1492 (4th Cir. Feb. 1, 2017). Regardless of which category is pursued, a *Bowman* claim "must find root in a state statute." *McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998) (citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 909 (Va. 1996)).

Here, Thompson asserts a type-1 *Bowman* claim on the grounds that she was retaliatorily terminated for retaining counsel, in contravention of Va. Code § 15.2-1507. (Pl.'s Opp. Br. p. 32, 34 [ECF No. 48].) But because Section 15.2-1507 creates a right and provides a remedy, it may not be used to assert a *Bowman* claim. "[W]hen a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *Vansant & Gusler, Inc. v. Washington*, 429 S.E.2d 31, 33 (Va. 1993) (cleaned up) (quoting *Sch. Bd. v. Giannoutsos,* 380 S.E.2d 647, 649 (Va. 1989)). Here, Section 15.2-1507 provides that a "grievant, at h[er] option, may have present a representative of h[er] choice," and that the "grievant may be represented by legal counsel at the final hearing." Va. Code Ann.

§§ 15.2-1507(A)(8)(c), (A)(10)(a)(5).[19] But the statute also provides that "acts of retaliation" are grievable. *See* Va. Code Ann. § 15.2-1507(A)(1)(iv). And the statute does not have any contrary language stating that the grievance procedure is not the exclusive remedy. As such, the statute specifically contemplates that employees pursue their grievances, including one for retaliation, in the manner set forth in the statute.

This same principle—that "when a statute creates a right and provides a remedy . . . then that remedy is exclusive unless the statute says otherwise," *Washington*, 429 S.E.2d at 33— has been similarly applied by numerous Virginia courts to find that statutes containing their own remedy cannot support a *Bowman* claim.[20] The principle has also been applied to statutes creating grievance procedures because they contain their own remedies. *See Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *14 (W.D. Va. Apr. 5, 2019) (finding that Va. Code Ann. § 2.2-3000 contained a "formal process for resolving employment-related disputes" and could not give rise to a *Bowman* claim because that would "enable a plaintiff to circumvent extensive remedial schemes crafted by the Virginia General Assembly, thereby rendering them

---

[19] The County incorporated these policies within its own grievance procedure as required by Virginia law. *See* Va. Code Ann. § 15.2-1506.

[20] *See, e.g., Humphrey v. Columbia/HCA John Randolph, Inc.*, 46 Va. Cir. 109, 111 (Cir. Ct. 1998) (Virginia Drug Control Act contains "a specific criminal penalty and enforcement mechanism" that "underscores the intent of the legislature that this statute was not to have a separate mechanism or civil enforcement under the exception to the employment-at-will doctrine"); *Judy v. Nat'l Fruit Prod. Co.*, 40 Va. Cir. 244, 244-45 (Cir. Ct. 1996) (Va. Code Ann. § 40.1-51.2:2 provides a remedy for employees "discharged or otherwise discriminated against . . . [because the employee has filed a safety or health complaint]," and therefore it cannot support a Bowman claim); *Pruitt v. Johnston Mem'l Hosp., Inc.*, 21 Va. Cir. 188, 188-89 (Cir. Ct. 1990) (holding that the availability of a statutory remedy for employee complaining of unsafe working conditions pursuant to the Virginia Safety Act, Va. Code Ann. § 40.1-44.1 et seq. precludes the bringing of a Bowman claim); *Cauthorne v. King*, 30 Va. Cir. 202, 203-05 (Cir. Ct. 1993) (Virginia Fair Housing Law, Va. Code Ann. § 36-96.1 *et seq.* provides its own remedies and therefore cannot support a separate Bowman wrongful discharge claim); *Gochenour v. Beasley*, 47 Va. Cir. 218, 224 (Cir. Ct. 1998) ("It has been long held that a civil statute which prohibits certain activity and provides specific remedies for an aggrieved party is self-contained and it is not the intent of the Legislature that it . . . could also serve as the basis of a Bowman type claim.")

a nullity"). But even assuming, without deciding, that § 15.2-1507 does create a basis for the *Bowman* claim here, no reasonable juror could conclude the decision to terminate Thompson (and her position) was in response to her decision to retain counsel.

Indeed, the record establishes that Thompson's supervisors began to consider transferring the CSA office to DSS in late 2019. (Davidson Dep. 90:5–18; King Aff. ¶ 16.) Although no decision was made to restructure the CSA office in 2019 (*Id.* 89:22–90:3), it was a foregone conclusion by January 3, 2020, prior to Thompson's receipt of her CANs and her subsequent retaining of counsel. By that time, a fair reading of the record indicates that Thompson's superiors had already begun targeting her and her position with the aim of excising her from the CSA office, regardless of whether she had retained counsel or not.

But Thompson contends that no decision to terminate her had been made until after she had retained counsel and that the decision was made because she had done so. (Pl.'s Opp. Br. p. 32, 34 [ECF No. 48].) To that point, Davidson (and presumably others) became aware that Thompson had retained counsel on January 22, 2020 (*see* Davidson Text Messages), and the CSA Manager position was, in fact, eliminated the next day. (King Aff. ¶ 18; *see* Administrative Board Minutes.) But this solitary fact does not create a genuine dispute on this issue. Instead, the totality of the record supports the conclusion that the Municipal Defendants made the decision to get rid of Thompson long before they became aware that she had retained counsel.

The record is abundantly clear that the transfer of the CSA office to DSS, without Thompson or her position, was discussed well before Thompson retained counsel; King expressed his displeasure with Thompson's inability to improve before she retained counsel;

- 49 -

and Davidson's correspondence with Mongold shows that, by January 3, 2020, she and Mongold were already rationalizing why Thompson and her position were not needed. Finally, when Thompson met with King and Davidson on January 21, 2022, before Thompson retained counsel, Thompson was told that the CSA office would be moved to DSS, and that such a move would not include her.

Accordingly, there is no genuine dispute of material fact that the decision to terminate Thompson was made without regard to her obtaining counsel. As such, the court will grant summary judgment as to Count VI.

## IV.   CONCLUSION

For the reasons stated, the court will deny the FES Defendants motion for summary judgment, in its entirety, and deny the Municipal Defendants' motion, with the exception of Counts I and VI. Accordingly, Counts II, III, IV, and V shall proceed to trial.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 21st day of March, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE